56 CCPA
**Application of Elroy M. GLADROW and Paul Thomas Parker.**

**Patent Appeal 8033.**

United States Court of Customs and Patent Appeals.

Feb. 27, 1969.

John J. Schlager, Whelan, Chasan, Litton, Marx & Wright, Elizabeth, N.J., for appellants.

Joseph Schimmel, Washington, D. C. (Jack E. Armore, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, SMITH, ALMOND and BALDWIN, Judges.

BALDWIN, Judge.

This appeal is from the Patent Office Board of Appeals decision affirming the examiner's rejection of all the remaining claims in appellants' application,[1] namely, claims 2–10, 12–14, 19, 21–34, 36–47, 49 and 50, on grounds of double patenting.

### THE INVENTION

The invention relates to a method for hydrocracking hydrocarbons by subjecting them to hydrocracking conditions in the presence of a particular catalyst including a platinum group metal combined with a large pore molecular sieve of zeolite. Appellants' specification summarizes the invention as follows:

> The present invention relates to the catalytic hydrocracking of hydrocar-

---

1. Serial No. 122,089, filed July 6, 1961, for "Hydrocracking Hydrocarbons With a Platinum Group Metal Containing Large Pore Molecular Sieve."

bons. It is more particularly concerned with a process wherein hydrocarbons are subjected to cracking in the presence of hydrogen and of a large pore zeolitic crystalline molecular sieve having uniform pore openings between 6 and 15 Angstrom units and composited, or impregnated with or supporting a platinum group metal or metal compound. Still more particularly, the present invention relates to the cracking of hydrocarbons in the presence of hydrogen and of a large pore molecular sieve supporting or composited with a metal or compound of the platinum group such as platinum, palladium, rhodium, iridium, ruthenium or the like, wherein the alkali metal content or the zeolite support is less than 10% by weight of the support, calculated as the alkali oxide.

Cracking of hydrocarbons in the presence of hydrogen is a well-known petroleum refinery operation and many catalysts have been used or suggested for this purpose. In general, it finds its highest degree of utility in cracking hydrocarbons boiling in the range of heavy naphtha and gas oils, though it also may be used for upgrading, by conversion to gas oil and gasoline, such fees as heavy gas oils and even higher boiling feed stocks. In general, hydrocracking may be applied to virgin and catalytic naphthas, gas oils, cycle oils and stocks from conventional cracking operations boiling generally in the gas oil range, and alkyl aromatic hydrocarbons in general, as well as straight run heavy virgin naphthas and gas oils. The process is also of interest in hydrodealkylation of alkyl aromatic fractions to lower boiling alkyl aromatic hydrocarbons and to totally dealkylated aromatics.

The hydrocracking process itself consists in passing the feed stock in admixture with hydrogen over the catalyst, if a fixed bed of catalyst is used, or in contact with a moving bed or a fluidized solids bed of catalyst at suitable temperatures, feed rates, pressures, etc., to effect a substantial conversion of the feed stock to lower boiling materials, such as gasoline. Simultaneously, organic nitrogen and sulfur components present in the feed are largely converted to ammonia and hydrogen sulfide respectively. The reaction conditions are to a considerable extent governed by the nature of the feed, the activity of the catalyst, and the nature of the desired end product.

A more detailed understanding of the subject matter in issue is provided by claims 21, 9, 19, 22, 26 and 47 reproduced below as representative of several groups into which the appealed claims may be separated.

21. An improved process for hydrocracking hydrocarbon streams to obtain products boiling lower than said hydrocarbon streams which comprises subjecting said hydrocarbons to hydrocracking conditions in the presence of added hydrogen and a catalyst comprising a platinum group metal composited with a crystalline metallo alumino-silicate zeolite having uniform pore openings between about 6 and 15 Angstrom units, said zeolite being characterized in that it contains no more than 10% sodium, calculated as $Na_2O$.

9. The process of claim 21 wherein said hydrocracking conditions include temperatures in the range of 550°F. to 1000°F., pressures in the range of 0 to 2000 psig., and space velocities between 0.6 and 10.0 weight of feed per weight of catalyst per hour.

19. An improved process for hydrocracking hydrocarbon streams contaminated with impurities selected from the class consisting of nitrogen compounds and sulfur compounds to obtain products boiling lower than said hydrocarbon stream which comprises, subjecting said contaminated hydrocarbon stream to hydrocracking conditions in the presence of added hydrogen and a catalyst comprising a plati-

num group metal deposited on a crystalline metallo alumino-silicate zeolite having uniform pore openings between about 6 and 15 Angstroms, said zeolite containing no more than 10% sodium calculated as $Na_2O$ by virtue of its having been base exchanged with a hydrogen-containing cation.

22. The process of claim 21 wherein said zeolite has a $SiO_2/Al_2O_3$ mol ratio between about 4 to 5.5.

26. The process of claim 21 wherein said zeolite has been base exchanged with a hydrogen-containing cation.

47. A process for hydrodealkylating a hydrocarbon stream rich in alkyl aromatics which comprises subjecting said hydrocarbon stream to hydrodealkylation at a temperature between about 910 and 930° F., at a pressure between about 200 and 285 psig., a feed rate of about 0.5 to 1.0 W/Hr./W in the presence of added hydrogen and a catalyst comprising a platinum group metal composited with a crystalline metallo aluminosilicate zeolite having uniform pore openings between about 6 and 15 Angstroms, said zeolite being characterized by a $SiO_2/Al_2O_3$ mol ratio of at least 2.2 and containing no more than 8.5% sodium calculated as $Na_2O$.

Claim 21 is the broadest appealed claim. Claims 2 and 3 are dependent thereon adding only that the platinum group metal is platinum and palladium, respectively. In claims 4, 5, 6, 7 and 8, limitations that the hydrocarbon is a gas oil fraction, a naphtha fraction, a residual oil, crude petroleum, and rich in alkyl aromatics, respectively, are added to claim 21.

Claims 19, 41–46, 49 and 50 recite that the hydrocarbon streams to be processed are contaminated with impurities "selected from the class consisting of nitrogen compounds and sulfur compounds."

Additional features of the zeolite composition are defined in claims 19, 26–30, 32, 38–40 and 42–46. While certain of these claims, as claim 19, recite that the zeolite is base exchanged with a hydrogen-containing cation, certain other claims in the group call for such base exchange to be with cobalt, zinc, nickel and cadmium cations, respectively.

Requirements that the process be carried out at specified ranges of hydrocracking temperature, pressure, space velocity and hydrogen rate are set out in claims 9, 10, 33, 37 and 40–47.

Lastly, claims 22, 25, 36–39, 41–46 and 50 require the high silica-to-alumina ratio of "4 to 5.5" in the zeolite component.

It will be apparent that certain claims, as for example, claims 19, 41–46, and 50, fall into more than one of the above groups. Claim 47 is the only claim employing the term "hydrodealkylating" instead of "hydrocracking."

In their brief, appellants emphasize certain aspects of the invention as follows:

Appellants' invention thus resides principally in the use of a particular catalyst for a particular hydrocarbon conversion reaction; namely, hydrocracking. The catalyst is characterized in the claims on appeal by three critical features: (1) a platinum group metal composited with (2) a crystalline metallo aluminosilicate zeolite (i. e. a "molecular sieve") having uniform pore openings of 6 to 15 Angstrom units, (3) which zeolite contains less than 10% sodium calculated as $Na_2O$. Appellants have further found that modification of this zeolite component by base exchange of its sodium with various cations, such as cobalt, nickel, zinc, cadmium and hydrogen-containing cations, is beneficial.

Finally, and as a separate embodiment, appellants have discovered that when the zeolite portion of this type of hydrocracking catalyst has a relatively high silica-to-alumina molar ratio, e. g. "4 to 5.5", the activity and stability of the overall catalyst are surprisingly and substantially improved.

## THE REFERENCES

The principal reference is not employed as prior art but is a patent[2] (hereinafter Gladrow) which issued to appellants on February 14, 1961, approximately five months before the filing date of the present application. The patent states that the invention therein

> relates to the preparation of catalyst, and more particularly to the preparation of catalysts suitable for the conversion of hydrocarbon fractions boiling in the naphtha range into products of improved antiknock properties.

Appellants further state in their brief (with references to record pages omitted):

> The Gladrow et al patent describes the upgrading of *naphtha fractions* (column 1, lines 18 and 22) with the zeolite catalyst and exemplifies "upgrading" by the reactions of "hydroforming, hydroisomerization, dehydrogenation, aromatization, cracking, and the like." (Column 1, lines 22 to 24.) The patent further discloses that the particular catalyst is "especially suitable for hydroforming hydrocarbon fractions boiling within the motor fuel boiling range" and specifies the hydroforming reaction conditions (column 3, lines 37 to 47). The pertinent examples of the Gladrow et al patent describe the use of the zeolite catalyst for hydrogenation, dehydrogenation and hydroisomerization.

As further pointed out in appellants' brief, Gladrow does not refer to "hydrocracking," to a zeolite catalyst having a silica-to-alumina molar ratio of "4 to 5.5," to use of gas oil, residual oil, or whole crude petroleum as feedstock, or to "hydrodealkylation." While Gladrow does disclose replacement of zeolite sodium with other metal cations and hydrogen cations, it does not specifically claim those modifications.

The more important aspect of Gladrow lies in the claims, of which 1, 4, 12 and 17 are reproduced below:

1. A process for upgrading hydrocarbons which comprises contacting a hydrocarbonaceous fluid at elevated temperatures with a hydrocarbon conversion catalyst selected from the class consisting of metals and compounds of the platinum group, oxides of molybdenum, chromium, tungsten, vanadium, nickel, copper, cobalt, cobalt molybdate, and mixtures thereof, deposited on a zeolitic crystalline molecular sieve alumino-silicate base having uniform pore openings between about 6 and about 15 Angstrom units, said molecular sieve being further characterized in that it contains no more than 10% sodium, calculated as $Na_2O$.

4. The process of claim 1 wherein a naphtha stream is hydroformed in the presence of said catalyst.

12. An improved hydroforming process which comprises contacting a hydrocarbon fraction boiling in the motor fuel boiling range at 600° to 1000° F., and at 50 to 1000 p. s. i. g., with a platinum catalyst deposited on a crystalline zeolitic molecular sieve alumino-silicate base having uniform pore diameter between 6 and 15 Angstrom units, said molecular sieve being further characterized in that it contains no more than about 10% sodium calculated as $Na_2O$.

17. An improved hydrocarbon conversion catalyst comprising a crystalline zeolitic molecular sieve alumino-silicate carrier impregnated with a platinum group metal, said carrier having uniform pore openings between 6 and 15 Angstrom units and containing no more than 10% sodium, calculated as $Na_2O$.

Secondary references are:
Haensel  2,479,110
Fleck et al (Fleck)  2,962,435
Rabo et al (Rabo)  3,130,006
 filed Dec. 30, 1959

Aug. 16, 1949
Nov. 29, 1960
Apr. 21, 1964

---

2. No. 2,971,904, issued on an application filed February 12, 1957.

Haensel relates to "a process for the reforming of a saturated gasoline fraction. in the presence of a particular catalyst and under selected conditions of operation." The patent further states that cracking or splitting of carbon bonds is "one of the important factors in a successful reforming process" and that "[c]ontrolled or selective cracking" is highly desirable in obtaining a final gasoline product of lower average molecular weight which will usually have a higher octane rating. Haensel further discloses that the desired selective cracking generally "comprises the splitting of a higher boiling hydrocarbon molecule into two molecules both of which are normally liquid hydrocarbons." It states that "the presence of hydrogen in the reforming zone further tends to decrease the amount of carbonaceous deposits on the catalyst" and that "[r]eforming processes effected in the presence of hydrogen are known as 'Hydroforming.'"

A specific embodiment in Haensel describes treatment of a straight run gasoline fraction, subjecting it to a temperature of about 600° to 1000° F. at a pressure of from about 50 to 1000 pounds per square inch, with a catalyst comprising "alumina, platinum" in an amount of from about 0.01% to 1% by weight and halogen ions from about 0.1% to 8% by weight, in the presence of about 0.5 to 10 mols of hydrogen. The patent further states that "[h]ydrocracking reactions are favored at temperatures within the range of from about 600° to about 700° F. and at pressures within the range of from about 500 to 1000 pounds or more" and that "aromatization reactions are favored at temperatures within the range from about 650° to 1000° F. and at lower pressures within the range of from about 50 pounds to about 400 pounds per square inch."

Fleck relates to catalytic cracking of hydrocarbon mixtures that are contaminated with certain organic nitrogen compounds. It points out that gas oil fractions which boil above about 400° F. are heated to temperatures in the order of 750 to 950° F. in contact with a cracking catalyst to produce automotive and aviation gasoline. It states that many petroleum hydrocarbon cracking stocks are contaminated with organic nitrogen stocks which "characteristically deactivate cracking catalysts and thereby reduce the yield of cracked gasoline." The patent discloses overcoming that problem by employing a cracking catalyst "such as acid treated natural clay and a natural or synthetic zeolitic metallo alumino silicate having pores of at least 7 A. in diameter." It is said that the presence of the zeolite in the catalyst "effectively neutralizes the catalyst against the adverse effects of the nitrogen compounds present in the feed."

Rabo relates to "decationized crystalline zeolitic alumino-silicates of the molecular sieve type." It states that "[a]mong the hydrocarbon converting processes which may be catalyzed" by those compositions are "cracking or hydrocracking processes." The patent states that the zeolite has a silica-to-alumina ratio "greater than 3 up to about 6." It is also disclosed that the zeolites may be base exchanged with "mono-, di-, and tri- valent metal ions, particularly those of groups I, II and III of the periodic table."

## THE REJECTION

The sole ground of rejection is double patenting in view of the claims of the Gladrow patent which, as already noted, issued to appellants approximately five months prior to the filing date of the present application. Broadly, the issue is whether the invention claimed here is patentably distinct from the invention defined in the Gladrow claims.

More specifically, the rejections involve reliance on the prior art including Haensel and, in some cases, Fleck or Rabo, and are on double patenting of the obviousness type. See In re Simmons, 312 F.2d 821, 50 CCPA 990 (1963); In re Braithwaite, 379 F.2d 594, 54 CCPA 1589 (1967); In re Rogers, 394 F.2d 566, 55 CCPA 1092 (1968). In terms of *Braithwaite*, the question is whether the difference between what is

claimed here and what is claimed in Gladrow is only "such a difference or modification as would be obvious to those of ordinary skill in the art in view of the prior art."

No terminal disclaimer having been filed, the rejections of the claims must be sustained where the difference is found to be obvious.

## OPINION

Claim 21, the broadest of the appealed claims, was rejected by the examiner on the claims of Gladrow "in view of the state of the art as shown in Haensel." The examiner compared Gladrow claim 12 [3] with appealed claim 21 stating that the difference in the claims lies in the patent claim reciting an improved hydroforming process while the appealed claim recites an improved process for hydrocracking hydrocarbon streams. In affirming the rejection, the board stated:

> Appellants imply that the various operations covered by the patent claims are totally distinct and separate, but the Haensel patent does not support this implication (column 7, line 20 et seq.). Haensel explains that the reforming in his process may be carried out at temperatures from 600° to 1,000° F. and with pressures within the range of from about 50 to about 1,000 pounds or more. Haensel states that at 600° to 700° F. and 500 to about 1,000 pounds (per square inch) or more pressure hydrocracking is favored. At a temperature of 650° to 1,000° F. and a pressure of 50 to 400 pounds, the patentee explains, aromatization is favored. Accordingly, in claim 12 of the Gladrow and Parker patent the patentees raise the reasonable expectation that the hydroforming operation would involve at least to some degree, hydrocracking. Looking to the patent's examples for an illustration of the operation claimed, we discover that Example 3, which

illustrates a dehydrogenating and hydroisomerizing procedure, utilizes added hydrogen and cracks the hydrocarbons, as indicated by the $C_5$ hydrocarbon fraction produced.

Since the platinum and palladium catalysts are, as Haensel illustrates, accepted catalysts for the various conversion operations, it would have been remarkable if the catalyst of the Gladrow and Parker claim 17 were not a hydrocracking catalyst and if the hydroforming called for had not resulted in part of a hydrodealkylation. Note in this respect that the "favoring" of one reaction has not been shown to exclude others.

Appellants argue that the appealed claims define "an entirely different and separate invention" and that "[t]he fact that the earlier claims may 'dominate' the claims on appeal is immaterial," citing In re Heinle, 342 F.2d 1001, 52 CCPA 1164 (1965). Of course, the first point is not controlling because the "obviousness type" rejection here is not based on the position that the same or identical invention is being claimed. Neither is any point regarding domination being made by the board, although appellants acknowledge that Gladrow claims subject matter which is generic to the invention claimed here. Also, it is urged by appellants that the board improperly treated the patent claims as prior art and further improperly interpreted them "not only to include species *disclosed* in the patent, but also *undisclosed* species which it found in the secondary references." We do not agree with that analysis. Rather the board inquired into whether the claimed process "would have been obvious to a person of merely ordinary skill in the subject matter" from a consideration of the invention claimed in Gladrow and the secondary references and regarded the process as but an obvious variation of that claimed in the patent.

---

3. It appears that he might alternatively have relied on Gladrow claim 4 which lacks any temperature and pressure

recitations but does specify use of a naptha stream.

Turning again to appealed claim 21, we think it plain that the board not only applied the right test but also reached the correct conclusion. The disclosure of Haensel that cracking is an important factor in a successful reforming process and that reforming processes effected in the presence of hydrogen are known as "Hydroforming," taken with the specific discussion of the conditions under which hydrocracking reactions are favored, amounts to convincing evidence that the use of the catalyst of the claimed Gladrow process under hydrocracking conditions for hydrocracking purposes would be but an obvious modification of that process. Appellants rely on certain literature abstracts, set out both in their brief before the board and in an appendix to their brief here, as presenting definitions of "Catalytic Reforming" and "Catalytic Hydrocracking" which constitute contrary evidence. Those abstracts are not convincing, however. While one states that "little hydrocracking" is wanted in catalytic reforming, nothing is found in either that contradicts Haensel's analysis. We, accordingly, find no reversible error in the rejection of claim 21.

Claims 2 and 3, which differ from Gladrow claim 21 in defining the platinum group metal as platinum and palladium, respectively, and claim 5, which differs from claim 21 in reciting that the hydrocarbon stream comprises a naphtha fraction, are not asserted by appellants to distinguish patentably from claim 21. It seems clear that they must fall with claim 21 since platinum and palladium are obviously known metals of the platinum group and naphtha is specifically disclosed as a feed stock in Haensel. It is also apparent that claims 12–14, 23, 24, 31, 32 and 34 must fall with claim 21. As pointed out in the commissioner's brief, appellants do not urge that there is a patentable distinction between any of those claims and claim 21, and we do not find any.

As to claims 4, 6, 7 and 8, which specify feed stocks other than naphtha, and claims 19, 41 to 45, 49 and 50 which call for feeds containing nitrogen or sulfur, appellants urge that conversion to lower boiling products is required. They contend that the rejection of those claims is in error, stating that "the hydrocracking of gas oil, crude, residual fractions, etc., to obtain lower boiling products is a quite *different invention* than the hydroforming of naphthas to boost octane number."

Of course, the requirement here is not merely that the invention of the appealed claims be different from that of the Gladrow claims but that it be *patentably* different, more specifically, that the invention of the appealed claims be unobvious. The record satisfies us that such is not the case. Haensel points out that cracking comprises the splitting of higher boiling molecules into two molecules of lower molecular weight, and it specifically discloses cracking in the presence of hydrogen, or hydrocracking. We think it would be obvious from Haensel to use a process similar to that claimed by Gladrow for hydrocracking not just relatively lower boiling stock, such as might be treated by hydroforming, but also higher molecular weight feed stocks.

As to the treatment of feed stocks containing nitrogen or sulfur, the disclosure in Fleck that zeolite in a cracking catalyst "effectively neutralizes" the catalyst against the adverse effects of nitrogen compounds present in feed stock suggests that the claimed invention of Gladrow, as adapted in an obvious manner to hydrocracking, might be used with stocks which include nitrogen compounds. Appellants point out that Fleck refers only to cracking and not to hydrocracking, but no significance is seen in that. No persuasive reason has been advanced why the advantageous effect which Fleck discloses the zeolite to provide in the former process would not be expected in hydrocracking also.

With respect to the group of claims specifying the metal compositions of various cationic forms of the zeolite, ap-

pellants' full argument before us is as follows:

> Claims 19, 26 to 30, 32, 36, 38 to 40, and 42 to 46 all define cationic modifications of the zeolite component that are not *claimed* by Gladrow et al (although they are disclosed therein). Claims 27 to 30, 39, 40, 42 to 45 define various metal *cations*. The Gladrow et al *claims* require metals to be *deposited* on the zeolite. Again, a different invention is involved.

Here again, the mere contention that a "different" invention is involved is not equivalent to an assertion that the present subject matter is *patentably* different from, or unobvious over, the Gladrow claimed invention; and we find nothing in the record to satisfy us that such is the case. The examiner has pointed out that appellants have not disclosed that the base-exchange metals specified are critical to their claimed hydrocracking process. Cf. In re Smatko, 393 F.2d 998, 55 CCPA 1102 (1968). Neither have they demonstrated that those particular metals provide unexpected results.

Appellants assert that claims 9, 10, 33, 37 and 40 to 46, in specifying hydrocracking temperatures, pressures, space velocities and hydrogen rates, define subject matter which is patentably distinct from the Gladrow claims. They point out that Gladrow claim 12 does not specify the space velocity and hydrogen rate and urge that those characteristics, "coupled with the feed definition and the extent of conversion desired, spell out the crucial differences between hydroforming and hydrocracking." However, we have already pointed out that the record satisfies us that use of a process similar to the Gladrow claimed invention for hydrocracking higher boiling stocks would have been obvious to one of ordinary skill in the art. Such use would necessarily include provision of conventional hydrocracking conditions, and the broad ranges of conditions recited here are not asserted by appellants to be critical or unconventional in hydrocracking. Neither have appellants taken issue with the statements in the Examiner's Answer, quoted in the commissioner's brief, that Haensel discloses "the claimed space velocities in hydrocracking to be conventional in the art" and that the amount of hydrogen employed in the Haensel process, from .5 to about 10 mols of hydrogen, "is within the claimed amounts in terms of hydrogen per barrel of hydrocarbon feed."

Appellants state that claim 47 requires a hydrodealkylation reaction at what they term "very specific conditions" of "910° to 930° F., 200 to 285 psig., 0.5 to 1.0W/Hr./W" and assert it is "clearly patentable over any of the references cited."

On that issue, the brief for the commissioner asserts (with references to the record omitted):

> It is evident from Haensel that hydrocracking is simply the splitting up *or off* of alkyl groups: therefore, in hydrocracking, the alkyl groups of alkyl aromatics would, depending on the extent of the reaction, either be diminished in the number of carbon atoms or be split off entirely. This has been implicitly so disclosed by the appellants; the appellants' second abstract in their appendix A indicates that hydrodealkylation is a form of hydrocracking and in fact occurs during hydrocracking when alkyl aromatic hydrocarbons are present—as they frequently, if not always, are. It is implicit in the Patent Office rejection of claim 47 that this state of facts was well known in the art—and that has not been denied by the appellants.

Appellants do not contradict that statement which appears amply supported by the record. Since there also is no basis to assume that the particular conditions specified are anything but conventional or obvious, the process of claim 47 cannot be regarded as patentably distinct from the Gladrow claimed invention.

Summarizing the foregoing, we are convinced from the record that the subject matter of appealed claims 2–10, 12 to 14, 19, 21, 23, 24, 26 to 34, 40, 47 and 49 is not patentably distinct from

the Gladrow claimed invention because it is obvious in light of the prior art as exemplified in Haensel and Fleck. We proceed then to the remaining appealed claims.

Those remaining claims, 22, 25, 36 to 39, 41 to 46 and 50, all specify that the zeolite component of the catalyst have a silica-to-alumina ($SiO_2/Al_2O_3$) ratio either "between about 4 to 5.5" or "between 4 to 5.5." The rejection of those claims involves reliance on Rabo to show obviousness of that feature. As already noted, that patent discloses the use in hydrocracking of hydrocarbons of a crystalline zeolite, designated zeolite "Y," wherein the silica-to-alumina ratio may range from "greater than 3 up to about 6." Appellants have filed an affidavit under Rule 131 which they assert shows the preparation and use, prior to the Rabo filing date, of a catalyst with a molecular sieve of the "X" variety, which variety has a lower silica-to-alumina ratio than that defined in the claims. They have also submitted a Rule 132 affidavit which they describe as clearly demonstrating the superiority of certain of their catalysts having relatively high silica-to-alumina ratios, e. g., 4 to 5.5.

■ Before us, appellants advance a novel argument concerning their Rule 131 affidavit. They state that, if the use of the "Y" zeolite is an obvious extension over the use of the "X" type, then the affidavit indirectly removes Rabo's "Y" teaching under the doctrine of In re Clarke, 356 F.2d 987, 53 CCPA 954 (1966) and In re Hostettler, 356 F. 2d 562, 53 CCPA 1069 (1966). Those cases do indicate that where a claim to a genus is being sought, a reference species may be antedated under certain conditions by showing prior invention of other patentably non-distinct species. However, they do not stand for the proposition that a showing of prior invention of a species can antedate a reference disclosing another species when it is the reference species for which a claim is sought. See In re Tanczyn, 347 F.2d 830, 832, 52 CCPA 1630 (1965). Thus the question whether Rabo's disclosure of the use of "Y" zeolite in its hydrocracking process demonstrates that the claimed process involving a zeolite having a silica-to-alumina ratio between 4 and 5.5 is obvious is not rendered moot by appellants' Rule 131 affidavit.

■ However, we are satisfied from the record that this issue of obviousness as to the claims requiring the 4 to 5.5 silica-to-alumina ratio must be decided in favor of appellants. They urged before the board that there is no teaching in Rabo that a high silica-to-alumina ratio in the zeolite catalyst would yield the unexpected results demonstrated in their Rule 132 affidavit. Before us they state that the high silica to alumina ratio was demonstrated in the Rule 132 affidavit "to result in manifold increases in catalyst activity and stability." The board's position on this issue is stated as follows:

The petition refers to the unexpected superiority of the hydrocracking catalysts of the claims in question. Assuming that this has been demonstrated, we did not find it unexpected to use for a catalyst base an aluminosilicate particularly recommended for hydrocracking purposes (see Rabo et al., column 2, lines 1 to 18).

Since there is no other comment by the board or the examiner on the Rule 132 affidavit, we think it has in effect been accepted below as demonstrating the superior results which for appellants claim for the "4 to 5.5" ratio in their process. Inspection of the affidavit shows that a zeolite catalyst having a 4.3 ratio had nearly five times the activity of a similar catalyst with a 2.6 ratio. In view of such apparent acceptance of the affidavit below, we do not feel justified in initiating a more critical examination of it here. It seems to us that the board erred in not attributing greater significance to the substantial superiority resulting from the claimed ratio in considering the question of obviousness. Our conclusion that Rabo does not demonstrate obviousness is reinforced by the fact that the zeolite catalyst dis-

closed therein lacks certain features of appellants' catalyst, including the incorporated platinum group metal.

The solicitor contends in the brief for the commissioner that there is no disclosure in appellants' application that the claimed ratio has "critical significance." However, that point is not shown to have been raised by the examiner or the board. Under the circumstances, we do not think we would be justified in considering it beyond noting that the application discloses, as an example, crystalline sieves "having $SiO_2/Al_2O_3$ ratios of about 4 to 5.5" and states that "in general the higher the $SiO_2/Al_2O_3$ ratio the greater the effectiveness."

The decision of the board is affirmed as to claims 2–10, 12 to 14, 19, 21, 23, 24, 26 to 34, 40, 47 and 49 and reversed as to claims 22, 25, 36 to 39, 41 to 46 and 50.

Modified.

SMITH, J., participated in hearing of this case but died before a decision was reached.