59 CCPA

**Application of Gerald J. MANTELL et al.**
**Patent Appeal No. 8577.**

United States Court of Customs
and Patent Appeals.
Feb. 17, 1972.

2. This opinion is written without oral argument pursuant to Rule 146(b) (2) of the Rules of this court.

William H. Drummond, Phoenix, Ariz., Eric P. Schellin, Arlington, Va., Richard L. Kelly, Springfield, Minn., attorneys of record, for appellants.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents, Fred W. Sherling, Washington, D. C., of counsel.

Before WORLEY, Chief Judge, and RICH, ALMOND, BALDWIN, and LANE, Judges.

LANE, Judge.

This appeal is from the decision of the Board of Appeals sustaining the rejection of claims, 1, 3, 6, 8, 9, 11, 12, 16 and 18[1] of appellants' application for "Formaldehyde Block Copolymers and Processes"[2] as unpatentable in view of Kirkland et al. (Kirkland)[3] under either 35 U.S.C. § 102 òr 35 U.S.C. § 103. We affirm as to claims 1 and 3, reverse as to claims 6, 16 and 18, and remand for further consideration of claims 8, 9, 11 and 12.

## THE INVENTION

The claims are drawn to block copolymers and their method of preparation, said copolymers being of the A–B and B–A–B types. The invention resides in the "A" unit which is a "polymer of a monomer which is capable of undergoing living polymerization in the presence of an anionic polymerization initiator to form a stable polymer having at least one anionic site." The anionic polymerization initiator is typically an organometallic compound. The "B" unit is a polyoxymethylene derived from formaldehyde.

According to appellants' specification:

The term "living" polymerization is a term of art which describes the phenomenon whereby under certain conditions certain monomers are capable of forming polymer chains of theoretically infinite length, i. e. they do not terminate spontaneously by monomer termination but will continue to grow as long as there is any monomer present in the polymerization mixture to form a polymer chain which is essentially stable even though it contains an ac-

---

1. Several claims narrower in scope than those before us have been indicated by the examiner to be allowable.

2. Serial No. 313,192, filed October 2, 1963.

3. U. S. Patent No. 3,219,725, issued November 23, 1965, on an application filed May 4, 1962.

tive site at the growing end, and which, if more monomer is added, will resume its growth until the newly added monomer is consumed.

Styrene, α-methyl styrene, methyl methacrylate, n-butyl methacrylate, isoprene, acrylonitrile and N,N-di-n-butyl-acrylamide are disclosed to be exemplary of suitable living polymers.

Briefly stated, the method of preparing the block copolymers comprises forming the "A" polymer followed by adding formaldehyde monomer until the polyoxymethylene chains have developed to the desired extent. Formaldehyde polymerization may be stopped by the addition of a suitable terminator and the polyoxymethylene chain is end-capped to avoid thermal depolymerization.

## THE CLAIMS

Claim 1 is the broadest of the claims on appeal and reads as follows:

> 1. A block copolymer comprising the structure A–B in which the A unit is a polymer of a monomer capable of undergoing living polymerization in the presence of an anionic polymerization initiator to form a stable polymer having at least one anionic site, and in which the B unit is a polyoxymethylene chain prepared by contacting monomeric formaldehyde with said living A unit polymer.

Claim 3 depends from claim 1 and specifies the block copolymer as of the A–B type.

Claim 6 is narrower than claim 1 in the scope of the "A" living polymer and reads:

> 6. An A–B type block copolymer in which the A unit is derived from a stable carbanionic polymer of a reactive ethylenically unsaturated polymerizable monomer which can be polymerized by the use of an anionic polymerization initiator without a chain termination step, and in which the B unit is a polymer of monomeric formaldehyde prepared by contacting monomeric formaldehyde with said living A unit polymer.

Claims 8, 9, 11 and 12 limit the "A" unit monomer to methyl methacrylate, n-butyl methacrylate, acrylonitrile and N,N-di-n-butylacrylamide respectively. Claim 16 is similar to claim 6 in that it is limited to ethylenically unsaturated polymerizable monomers, and it additionally specifies that the "A" unit polymer is the initiator of formaldehyde polymerization.

Claim 18 is the sole process claim on appeal and like independent claims 6 and 16 is limited to ethylenically unsaturated monomers. Claim 18 reads:

> 18. A process for preparing the block copolymer of Claim 1, which process comprises in combination the steps of contacting a reactive ethylenically unsaturated polymerizable organic monomer which is capable of undergoing living polymerization with an anionic polymerization initiator under living polymerization condition [sic] of temperature, pressure and monomer purity, whereby a stable carbanionic polymer of said monomer is obtained, contacting said stable polymer with formaldehyde monomer under essentially anhydrous conditions and under conditions of temperature and pressure suitable for formaldehyde monopolymerization, whereby the polymerization of formaldehyde monomer is initiated by said carbanionic polymer and whereby the polymer of formaldehyde thus initiated is united with said polymer at the anionic site thereof to form said block copolymer, and recovering said copolymer from the copolymerization mixture.

## THE REJECTION

As noted above, the claims stand rejected over Kirkland which discloses the formation of a block copolymer of a polyoxymethylene and a living polymer. Patentees teach the following with respect to the living polymer unit of the copolymer:

> Among the monomers capable of polymerization by anionic initiation which may be used in accordance with

this invention are ethylenically unsaturated monomers (vinyl and vinylidene monomers), olefin oxides, higher aldehydes, alkyl and aryl isocyanates and isothiocyanates.

The vinyl monomers are those which contain some functionality in addition to the vinyl double bond. The vinyl monomers may be a hydro-carbon which contains an additional double bond such as isoprene or butadiene, or contains an aromatic ring, such as styrene or α-methyl styrene. Alternately, the vinyl or vinylidene monomer may contain a functional substituent other than a substituent having an unblocked carbonyl oxygen atom. Suitable vinyl monomers include styrene, α-methyl styrene, isoprene, butadiene, acrylonitile [sic], methyl methacrylate, ethyl methacrylate and t-butyl acrylate. Suitable olefin oxides include ethylene oxide, propylene oxide and styrene oxide. Suitable higher aldehydes include propionaldehyde and butyraldehyde.

The board also referred to Weissermel [4] apparently for the purpose of demonstrating additional polymers which may be termed living polymers. This patent discloses block copolymers formed from formaldehyde and epoxides polymerized by using an anionically active organometallic catalyst. Appellants do not contest the examiner's holding that Kirkland teaches the claimed invention. The sole issue before us is the sufficiency of a Rule 131 affidavit of the inventors alleging conception and reduction to practice of the generic invention prior to the effective date of the reference.

### OPINION

*Claims 1 and 3*

Appellants allege that the evidence accompanying the affidavit establishes a generic conception of the invention coupled with actual reduction to practice of two species all prior to the effective date of the Kirkland patent and contend that such a showing is sufficient to establish possession of the generic invention prior to the reference as a matter of law. Heavy reliance is placed on the following statement which appeared in an internal report circulated in the research department of appellants' assignee as evidence of a generic conception:

> Block copolymers, wherein one has a sequence of one monomeric species followed by a sequence of the other monomeric species, can be prepared if one has a "living" polymer.

The report deals with block copolymers of such living polymers with formaldehyde, and there is no dispute with respect to the polyoxymethylene portion of the copolymer. Appellants stress the word "can" in the above statement, the use of which is apparently believed to be an expression of certainty and appreciation of the broad generic concept of employing any and all living polymers. Copolymers were synthesized by appellants from the living polymer species styrene and isoprene prior to Kirkland's effective date.

As is evident from the portions reproduced above, Kirkland's disclosure is generic with respect to the living polymer. In addition to styrene and isoprene, which are ethylenically unsaturated monomers, Kirkland discloses other monomers, e. g., higher aldehydes. In terms of specifically named polymers, the affidavit evidence shows reduction to practice of much less than the reference shows. We therefore have before us a case of attempted "indirect antedation" as that concept has evolved in In re Walsh, 424 F.2d 1105, 57 CCPA 1033, (1970); In re Da Fano, 392 F.2d 280, 55 CCPA 1134 (1968); In re Rainer, 390 F.2d 771, 55 CCPA 853 (1968); and In re Clarke, 356 F.2d 987, 53 CCPA 954 (1966).

Appellants contend that *Walsh* and *Da Fano* control, whereas the solicitor argues that *Clarke* and *Rainer* apply.

---

4. U. S. Patent No. 3,379,739, issued April 23, 1968.

The position of the board may be gleaned from the following:

> [W]e are bound to follow the most recent pronouncements of the Court of Customs and Patent Appeals on this question. [In] In re Rainer et al., * * * [the court indicated] that a showing of a prior reduction to practice of every embodiment of an invention is not required observing however as in In re Clarke * * * that mere prior conception does not suffice. The court then stated "The question is whether the species which have been reduced to practice suffice to provide a basis for a reasonable inference of possession of the generic invention."

> Applying this principle to the instant state of facts, we find ourselves in complete agreement with the Examiner that styrene and isoprene fall far short of meeting this requirement.

A principal contention of appellants is that, like the situations in *De Fano* and *Walsh*, appellants here have established a prior *generic* conception. The invention in *Da Fano* was the inclusion in a resin system of "a minor effective proportion of a copper salt of an organic acid sufficient to provide at least about 0.008 part per million of copper * * *."[5] The reference applied against the *Da Fano* claims disclosed the use of copper salts in a similar resin system, and the affidavit evidence filed under Rule 131 to antedate the reference showed the reduction to practice of the invention using but one copper salt, coupled, however with forceful evidence of the fact that the inventor regarded the particular salt as of relatively minor importance as compared to the copper which the salt yielded in the system. In other words, there was every indication that the inventor regarded his discovery as the provision of copper in the system,

with the salt merely being its source. Even so, this court held that:

> Mere prior conception of the genus will not suffice, however, as was pointed out in *Clarke*. It is necessary that the species which were reduced to practice provide an adequate basis for inferring that the invention has generic applicability. In re Rainer * * *.[6]

That legal proposition was applied in *Walsh* as well where the invention was a class of organophosphorous compounds defined generically by structural formula; the reference disclosed a compound falling within the genus, and the Rule 131 affidavit evidence established that the appellants conceived the genus and reduced to practice a position isomer of the reference compound as well as other species. We were satisfied that the species reduced to practice afforded "a reasonable basis for inferring that the position isomers of that species would also be useful as pesticides,"[7] and we had no doubt that the evidence demonstrated that appellants considered their invention to be generic.

■ We also stated in *Walsh* that:

> As in *Da Fano*, we "find nothing in this record to indicate that this inference was unreasonable, and subsequent developments appear to indicate that it was in fact well founded."[8]

Appellants would read the latter expression as a kind of reversal of the burden of proof, i. e., as giving rise to a presumption that a generic conception exists in the absence of evidence to the contrary. Appellants point to *Rainer* as a situation in which the inventors' own statements cast doubt on the generic applicability of the invention. However, this was not the basis for the decision in *Rainer*, and as is apparent from the application of that case in our subsequent

---

5. 392 F.2d at 281, 55 CCPA at 1135.

6. 392 F.2d at 284, *Id.* at 1139.

7. 424 F.2d at 1108, 57 CCPA at 1037.

8. *Id.*

decisions, is not the way *Rainer* has been interpreted. As we said in *Rainer*:

> We do not believe that appellants have shown the reasonableness of the inference in this case.
>
> \* \* \* \* \* \*
>
> Appellants have made no attempt to show that generic applicability would be a reasonable inference from their experiments of record.[9]

■ Similarly, we do not think the evidence in the present case affords a reasonable basis for inferring generic applicability of the invention. Although the internal report which is relied upon expresses optimism with respect to the formation of block copolymers from living polymers as a broad class, there was a recognition that future investigation, including "screening other possible comonomers for 1:1 block copolymerization," would be necessary. More importantly, we do not regard the reduction to practice of only styrene and isoprene copolymers a fair base from which to conclude with any reasonable certainty that the rather extensive number of polymers embraced by the generic term "living polymer" would be conducive to polyoxymethylene block copolymerization. Our view is reinforced by Kirkland's disclosure which extends beyond ethylenically unsaturated monomers and Weissermel's teaching from which polyepoxides, much different from ethylenically unsaturated polymers, may be assumed to be living polymers. We therefore agree with the board that the affidavit evidence of record is insufficient to establish possession of the *generic* invention prior to the effective date of Kirkland.

### Claims 6, 16 and 18

■ Our conclusion with respect to the generic invention is not dispositive of this appeal. The board also stated:

> [T]here was no showing of due diligence in reducing to practice species

other than the ethylenically unsaturated hydrocarbons isoprene and styrene.

\* \* \* \* \* \*

At the very most the so-called generic concept could not be considered to extend beyond hydrocarbon vinyl monomers and none of the generic claims before us is so restricted.

Throughout his argument at oral hearing, the solicitor repeatedly stressed that, at best, appellants have shown prior possession of the subclass of living polymers limited to polymers from vinyl monomers. In response, counsel for appellants urged us to reverse the rejection of those claims limited to polymers from ethylenically unsaturated monomers asserting the terms "vinyl" and "ethylenically unsaturated" to be identical. This is not exactly a new argument since in their request for reconsideration of the board's decision, appellants stated:

> Except for claims 1 and 3, Applicants have antedated Kirkland with their showing of ethylenically unsaturated species which were actually reduced to practice before the effective date, from which species the operability of the methacrylate and olefin oxide species of Kirkland would be obvious.

The board's response was simply that "we find no merit in the argument advanced \* \* \*." The solicitor did not respond to this particular argument nor did he dispute the accuracy of appellants' contention that "vinyl" and "ethylenically unsaturated" are coextensive. While we do not necessarily regard the solicitor's silence as a tacit admission of the correctness of appellants' technical assertion, we are convinced that given possession of the vinyl subgenus, as both the board and solicitor appear to have conceded, possession of the "ethylenically unsaturated" subgenus may be reasonably inferred, nothing of record appearing to be to the contrary. Claims 6, 16 and 18 are limited to this sub-

genus, and in view of the special posture in which this case is presented to us, we reverse the rejection of those claims.

### Claims 8, 9, 11 and 12

These claims depend from claim 6 and are limited to the species methyl methacrylate, n-butyl methacrylate, acrylonitrile, and N,N-di-n-butylacrylamide respectively. There is no evidence of actual reduction to practice of any of these species prior to the effective date of the Kirkland patent. Two of these species, methyl methacrylate and acrylonitrile, are disclosed by Kirkland, whereas n-butyl methacrylate and N,N-di-n-butylacrylamide are not.

The board focused on the generic claims in this case, and we do not have the benefit of its analysis of the effect of the Rule 131 showings on these species claims. Because we feel that significant issues are raised with respect to these species claims, we remand this case to the Patent Office for further consideration thereof.

On remand, the Patent Office should consider separately the status of claims drawn to species which are disclosed in the reference and those directed to species not disclosed in the reference to determine whether different showings under Rule 131 are required. In each instance, consideration should be given the sufficiency of the affidavit showing as applied to the remanded claims. The cases which have typically come before this court involving Rule 131 and genus-species relationships have pertained either to genus claims or genus and species claims wherein the claimed species have been actually reduced to practice prior to the reference date. The claims herein remanded present the situation of being directed to species which have not been reduced to practice prior to the effective date of the reference, but which are within a subgenus possession of which may be reasonably inferred from other species which were reduced to practice. Compare In re Gladrow, 406 F.2d 1376, 1384, 56 CCPA 927, 938 (1969).

The decision of the board is affirmed as to claims 1 and 3, reversed as to claims 6, 16 and 18, and the case is remanded to the Patent Office for further consideration of claims 8, 9, 11 and 12.

Modified and remanded.

59 CCPA