**Julius CIRIC, Appellant,**

v.

**Edith M. FLANIGEN et al., Appellees.**

**Patent Appeal No. 74–604.**

United States Court of Customs and Patent Appeals.

March 20, 1975.

Claude E. Setliff, Atlanta, Ga., attorney of record, for appellant. Oswald G. Hayes, New York City, of counsel.

Richard G. Miller, New York City, attorney of record, for appellees.

Before MARKEY, Chief Judge, RICH, LANE and MILLER, Judges, and ALMOND, Senior Judge.

MILLER, Judge.

This is an appeal by senior party-appellant from the decision of the Board of Patent Interferences [1] awarding priority to junior party-appellees on the basis of their actual reduction to practice prior to appellant's earliest filing date. The only element of the actual reduction to practice challenged by appellant is utility. We affirm.

The interference involves novel synthetic crystalline zeolites described in a

1. Interference No. 97,532 between Ciric (senior party-appellant) on his application No. 722,149, filed April 18, 1968, and accorded the benefit of application serial No. 509,568, filed November 24, 1965, and Flanigen and Kell-berg (junior party-appellees) on their application serial No. 655,318, filed July 24, 1967, and accorded the benefit of serial No. 569,805, filed August 3, 1966.

count[2] which does not specify any particular use. Consideration of the sole issue before us involves the properties of the known class of crystalline zeolites and the relationship between the new zeolites of the count and that known class. Appellant's specification states:

> Zeolitic materials, both natural and synthetic, have been demonstrated in the past to have catalytic capabilities for various types of hydrocarbon conversion reactions, especially catalytic cracking. Certain of these zeolitic materials comprise ordered, porous *crystalline* aluminosilicates having a definite crystalline structure, as determined by X-ray diffraction, within which there are a large number of small cavities which are interconnected by a series of still smaller channels or pores. These cavities and pores are precisely uniform in size within a specific zeolitic material. Since the dimensions of these pores are such as to accept for *adsorption* molecules of certain dimensions while rejecting those of larger dimensions, these materials have come to be known as *"molecular sieves,"* and are *utilized in a variety of ways to take advantage of the adsorptive properties* of these compositions.

> These molecular sieves include a wide variety of positive ion-containing crystalline aluminosilicates, both natural and synthetic. . . . All can generally be described as having a rigid 3-dimensional network of $SiO_4$ and $AlO_4'$ in which the tetrahedra are cross-linked by the sharing of oxygen atoms whereby the ratio of the total aluminum and silicon atoms to oxygen atoms is 1:2. [Emphasis added.]

The specification also indicates that the new zeolites in sodium form are useful as adsorbents for gases and liquids, such as water and cyclohexane.

In a similar fashion, appellees' specification states:

> The openings [in the channels of the zeolite crystal lattice] limit the size and shape of the molecules that can be adsorbed. A separation of mixtures of molecules based upon molecular dimensions, wherein certain molecules are adsorbed by the zeolite while others are refused, is therefore possible. It is this characteristic property of many crystalline zeolites that has led to their designation as "molecular sieves." . . .

> In addition to the unique adsorption properties of zeolitic molecular sieves, certain of these materials, particularly when chemically modified, are excellent catalysts . . . .

> Over the past few years about 30 species of synthetic crystalline zeolites have been prepared. . . . The existence of a number of zeolites having similar but distinguishable properties advantageously permits the selection of a particular member having optimum properties for a particular use.

> The present invention has as its prime object the provision of a novel synthetic crystalline zeolite of the molecular sieve type. Another object is to provide a novel synthetic crystalline zeolite having useful adsorption properties.

The rigid framework of crystalline zeolites accounts for their ability to selectively adsorb various substances based

2.  The count of the interference is a phantom count drafted in Markush form to encompass the respective definitions of each party of the novel synthetic crystalline zeolites:

> A synthetic crystalline zeolite selected from the group consisting of (A) a crystalline zeolite having a composition in terms of mole ratios of oxides as follows: $0.9 \pm 0.2$ $[xR_2O + (1-x)M_{2/n}O]$ : $Al_2O_3$ : 3-20 $SiO_2$ : z $H_2O$ wherein R is tetramethylammonium, M is an alkali metal [cation, n is the valence of said cation], z is between 0 and 20, and x is between 0.01 and 0.5, said zeolite having the X-ray powder diffraction

pattern as set forth in Table 1 of Serial No. 722,149 and (B) a crystalline zeolite having a composition in terms of moles of oxides as follows:
$x[(CH_3)_4N]_2O$: y $Na_2O$: $Al_2O_3$: z $SiO_2$: 0-10 $H_2O$
wherein x has a value of from about 0.11 to about 0.61; y has a value of from about 0.71 to about 0.94; and z has a value of from about 5 to about 10.4; said zeolite having an X-ray powder diffraction pattern as set forth in Table A of Serial No. 655,-318.

on molecular dimensions and to undergo ion exchange. Thus, crystalline zeolites are known for their adsorptive and ion exchange properties.[3] Appellant agrees that those properties are used to distinguish a crystalline zeolite, but argues that they should not be employed for the ipso facto finding of utility. However, appellant does admit that crystalline zeolites have a wide variety of utilities. Furthermore, knowledge of the properties of crystalline zeolites and examples of the wide varieties of utility are demonstrated in the opinions of this court[4] and in the following definition from The Condensed Chemical Dictionary, 759–60 (6th ed. 1961):

> MOLECULAR SIEVES. Zeolites or similar materials whose atoms are arranged in a crystal lattice in such a way that there are a large number of small cavities interconnected by smaller openings or pores of precisely uniform size. Normally these cavities contain water molecules, but upon heating, this water is driven off without any change in the remaining crystal lattice. The network of cavities and pores may occupy 50% of the total volume of the crystals.
>
> Molecular sieves have a strong tendency to readsorb water. In the absence of water they will adsorb other molecules that are small enough to pass through the pores. These small molecules may thus be separated from a mixture with larger molecules.
>
> .     .     .     .     .
>
> Uses: Drying gases such as air, hydrogen, natural gas, refinery gas, ethylene; drying liquids such as benzene, alcohols, hydrocarbons, fluorocarbons; separation of ethylene from carbon dioxide, carbon dioxide from annealing gas, hydrogen sulfide

from natural gas; removal of normal paraffins from light naphthas. Also as a carrier for volatile, toxic, odoriferous, or reactive compounds, which can then be released by heat or displacement at the desired time and place. Materials that have been so carried include organic and metalloorganic compounds, halogen elements, acid gases, water, perfume, catalysts, pesticides, fumigants, ripening agents, radioactive isotopes, blowing agents, antioxidants in rubbers and plastics.

Appellant does not challenge the board's findings that appellees prepared two samples within the terms of the count; that the composition of the samples was confirmed by chemical analysis; or that the crystalline structure was confirmed by X-ray diffraction. Nor has appellant challenged the tests on one sample showing ion exchange with calcium, potassium, and ammonium ions or the tests on another sample demonstrating a reversible gain and loss of water. After correctly stating the well-established rule that, where an interference count does not specify any particular use, evidence establishing a substantial utility for any purpose is sufficient to prove reduction to practice, the board declined to take administrative notice of the capability of crystalline zeolites to be employed as water softeners because it did not regard that to be a matter of common knowledge. However, the board did take administrative notice of five patents, not previously of record or submitted by either party, which disclosed the use of crystalline zeolites as water softeners or as ion exchangers. In view of the noticed patents, the board held that appellees had established a practical utility for the zeolites of the count—namely as an ion exchanger, one of whose uses is the softening of natural water.

---

**3.** One of the most common adsorptive properties is the reversible loss and gain of water.

**4.** Parker v. Frilette, 462 F.2d 544, 59 CCPA 1311 (1972); In re Mattox, 461 F.2d 826, 59 CCPA 1272 (1972); In re Michel, 461 F.2d 1384, 59 CCPA 1088 (1972); In re Kamm, 452 F.2d 1052, 59 CCPA 753 (1972); In re Frilette, 436 F.2d 496, 58 CCPA 799 (1971); Frilette v. Kimberlin, 412 F.2d 1390, 56 CCPA 1242 (1969); and In re Gladrow, 406 F.2d 1376, 56 CCPA 927 (1969).

## OPINION

■ As noted above, when a count does not recite any particular utility, evidence establishing a substantial utility for any purpose is sufficient to prove reduction to practice. Rey-Bellet v. Engelhardt, 493 F.2d 1380 (CCPA 1974); Engelhardt v. Judd, 369 F.2d 408, 54 CCPA 865 (1966).

■ On several occasions, this court has held that utility of a new composition was established by demonstrating a similarity of properties of the new composition to established properties of a known class of compositions having known utility. Thus, in Silvestri v. Grant, 496 F.2d 593 (CCPA 1974), cert. denied, 420 U.S. 928, 95 S.Ct. 1126, 43 L.Ed.2d 399 (1975), we held the utility of Form II ampicillin to be obvious because it was—

> not a new compound but a new form of an old one, i. e., ampicillin. There is *no reason to believe* that the crystal structure and absence or presence of bound water would affect the pharmacological properties of ampicillin. Furthermore, the tests in question were run to demonstrate shelf stability of specific lots. Nevertheless utility can be *inferred* from these tests because a harmful bacterium was killed even though the tests were not run for that purpose. [Emphasis added.]

Rimbach v. Wanmaker, 362 F.2d 561, 53 CCPA 1552 (1966), was an interference involving a phosphor composition for use in high pressure, mercury vapor lamps. There was no dispute that a phosphor composition was made and that fluorescence and temperature dependence tests were performed on it to simulate a high pressure mercury arc. The board held the tests insufficient to establish a reduction to practice because the phosphors had not been tested in a high pressure, mercury vapor lamp. In reversing, this court said that utility of a phosphor composition would be "known to those of ordinary skill in the art once the phosphor composition was made known and it was tested under the laboratory test conditions, which the record establishes was done, with results which such a person could then apply to other uses."

Another interference case, Breen v. Miller, 347 F.2d 623, 52 CCPA 1539 (1965), involved a method of producing a filament. The court found that every step of the process had been met and that the filaments had been submitted for testing of physical properties. Concerning the element of utility for the filament, the court stated:

> However, we are not satisfied that the filament's utility is not "apparent." To the contrary, the filament in question so clearly *resembles* previously known filaments of organic polymers, i. e., nylon, that it obviously would be useful for the same purpose as such filaments. [Emphasis added.]

In In re Folkers, 344 F.2d 970, 52 CCPA 1269 (1965), this court reversed the rejections of claims to certain hydroquinone and quinone derivatives PA 74–604 under 35 U.S.C. § 101 for lack of utility and under 35 U.S.C. § 112 for insufficient disclosure of how to use. It said (emphasis added):

> We agree with the examiner that in many cases there is a difference between discovery of a *property* of a chemical compound and *utilization* of that property in a physical embodiment to accomplish a useful result. But what we think the Patent Office has overlooked here is that usefulness of a chemical compound is invariably a manifestation of a given property of that compound. We think *some uses can be immediately inferred from a recital of certain properties.* . . .

> . . . It is uncontroverted in the record before us that appellants' compounds are hydroquinone and quinone derivatives and share the *property* of oxidation-reduction capacity which hydroquinone and quinone compounds *in general* possess. Since appellants' newly discovered compounds *belong to a class* of compounds, the members of which have become *well recognized as useful* for a particular purpose because of a particular property, the only rea-

sonable conclusion is that the new compounds, also possessing that property, *are similarly useful.*[5]

In light of the foregoing precedents and recognizing that known crystalline zeolites have a variety of substantial utilities, the decisive question on this appeal is whether appellees' tests established for their new zeolites a sufficient number of properties in common with known crystalline zeolites to support an inference of utility.[6]

One key property of known crystalline zeolites is their ability to undergo ion exchange. As noted above, appellant does not challenge the ion exchange tests showing that zeolites within the count undergo ion exchange with calcium, potassium, and ammonium ions. (The record shows a resulting mole percent exchange with the sodium ions of the sodium monoxide in the zeolite structure of 66%, 92%, and 91%, respectively.)

The adsorptive properties of known crystalline zeolites are also significant, particularly the reversible loss and gain of water. Again, appellant has not challenged the experiments on a sample of the zeolites of the count showing the reversible loss and gain of water. A similarity of adsorptive properties between the zeolites of the count and known crystalline zeolites is further demonstrated by appellees' test data showing adsorption of oxygen, carbon dioxide, nitrogen, isobutane, and n-butane.

In view of the demonstrated similarity of ion exchange and adsorptive properties between the newly discovered zeolites and known crystalline zeolites, we hold that appellees have established a substantial utility for the zeolites of the count. Thus, it is unnecessary to reach the propriety of the board's action in taking administrative notice of certain prior art patents.

The decision of the board is affirmed.

Affirmed.

5. *Folkers* was cited for continuing validity with regard to the proposition that a product may not be patented absent a showing of utility in Brenner v. Manson, 383 U.S. 519, 535, 86 S.Ct. 1033, 16 L.Ed.2d 69 (1966).

6. We are not concerned with unpredictable utilities (e. g. catalysis), but only predictable utilities. Compare Kyrides v. Bruson, 102 F.2d 416, 26 CCPA 986 (1939) with Blicke v. Treves, 241 F.2d 718, 44 CCPA 753 (1957).